IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WARREN CORLEY,

      Petitioner,

v.

J. MCGRATH, Warden

      Respondents.

No. C 01-3905 SBA (pr)

**ORDER DENYING CERTIFICATE OF APPEALABILITY**

      Petitioner Warren Corley (Petitioner) filed a habeas corpus action pursuant to 28 U.S.C. § 2254. On March 31, 2005, this Court denied Petitioner's petition for a writ of habeas corpus (March 31, 2005 Order). On April 29, 2005, Petitioner filed a request for a Certificate of Appealability ("COA") and Notice of Appeal pursuant to 18 U.S.C. § 2253.

      A habeas petitioner may not appeal a final order in a federal habeas proceeding without first obtaining a COA (formerly known as a "certificate of probable cause to appeal"). 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b); Slack v. McDaniel, 529 U.S. 473, 482 (2000). A COA should be granted "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Section 2253(c)(2) codified the standard announced by the United States Supreme Court in Barefoot v. Estelle, 463 U.S. 880, 892-93 (1983). In Barefoot, the Court explained that "a substantial showing of the denial of [a] federal right" means that a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner], or that the questions are adequate to deserve encouragement to proceed further." Id. at 893 n.4 (emphasis in original).

      In the instant case, the habeas petitioner seeks a COA on three issues:

(1) Whether the admission of the phrase "that's it" and the Prosecutor's comments on Petitioner's

post-<u>Miranda</u> silence and use of it to infer guilt constituted a harmless error

(2) Whether Petitioner's trial counsel provided constitutionally ineffective assistance

(3) Whether the exclusion of testimony from the police officers regarding whether Plaintiff could have overheard details of the crime while being detained violated his due process rights.

## BACKGROUND

**A.     Factual Background**[1]

    **1.     The Arrest**

On Friday January 2, 1998, at approximately 2:00 p.m., Young Shim Park Lee's ("Lee," or "victim") small neighborhood store was robbed. (TR 412-414.) The store is known in the neighborhood as Joe's Market, however the sign outside the store simply says "Market."

Lee testified that a Black male, approximately twenty-five years old, wearing a "Black beanie on his head and a, a [sic] like full jacket and a, a [sic] like kind of black pants and shoes [sic]" entered the store at approximately 2:00p.m. (TR 414.) She also stated that the man had a mustache and a gap between his front teeth. The man went to the rear of the store, took a bottle of orange juice and brought it to the front of the store. The man asked the price, placed the bottle on the counter then left the store "to get some money." (TR 418-24.) After the man left, Lee saw him outside with another man, with a grey curly beard, holding a bicycle who "look [sic] a little older . . . a little more skinny" than the first man. (TR 415.) This second man was wearing similar clothing to that of the first man: a black beanie and a jacket and black pants. (TR 436.)

The first man reentered the store and immediately walked around to the register area and bumped Lee into the corner with his chest. The man yelled at Lee to open the register. Lee became frozen with fear. When she hesitated, the man punched her on the left side of her face, knocking her to the floor. She became sick to her stomach and suffered from dizziness and blurry vision. (TR 425-28.) The man continued demanding that Lee open the register. Out of fear, Lee reached up and opened the register. While on the floor she noticed that the robber had similar running shoes to those of her husband. The man reached over Lee's head and grabbed between $100.00 and $150.00 from the register and fled. Lee

---

[1]The facts are taken from the March 31, 2005 Order unless otherwise noted.

2

quickly notified the police and at 2:18 p.m. San Jose police broadcast the robbery. (TR 429-46.)

Officer Matt McLinden testified that he was the first officer at Joe's Market. He found Lee upset, crying, and hysterical, and with a facial bruise for which she refused medical treatment. A dispatch was put out with a description of the robber. Officer Fagalde heard the radio broadcast of the description that came out at approximately 2:20 p.m. (TR 568.) He testified that the description brought to mind two Black males he had seen on bikes a couple of hours earlier. Officer Fagalde went to the scene of the crime to alert the officers that he had seen these individuals. Based on additional description from the witness, a more specific description was sent out at 3:04 p.m. (TR 570.)

The initial report of two Black males, one older with grey beard was changed to two Black males, one approximately 20 to 30, 5'8" to 5'10" broad shoulders, possible muscular build, dark knit hat, possible facial hair on the upper lip, upper front tooth missing and waist length black zippered jacket with something gray on the front and black pants, and the second old or older and skinnier than the first one, with grey facial hair, dark clothing, on a bike with racing style handle bars. (Id.) Petitioner is 5'5" inches tall, 160 pounds, missing four front teeth and was 36 years old at the time of the robbery.

Around 3:14 p.m., the same day, San Jose Police Officer Edward Conover noticed and detained three possible robbery suspects at a bus stop about 1.2 miles from Joe's Market. The detention was based on the second description received at 3:04 p.m. (TR 623-625.) A pat search was conducted but no money was discovered on the detained suspects or Petitioner. Several officers showed up to assist Officer Conover after the bus stop detention. Officer McLinden brought the victim to the bus stop where Petitioner was detained for an in-field showing. While Lee was in the police car, Petitioner was brought to the car and stated, "I didn't do it." (TR 445, 689.) Lee recognized the gap in Petitioner's teeth and told the officer in the car with her at the time, "that's him." (TR 444.) However, Lee also expressed uncertainty because the "shirt, pants, the hat, makes me a little bit confused about the outfit [sic]." (TR 502-504.) Because of Lee's uncertainty, Petitioner was released. (TR 629, 673.) Lee testified at a preliminary hearing and at trial. She testified that she became certain about Petitioner's identity after the initial show

3

1  up.[2]

2  Officer Michael Johnson arrived at Joe's Market at 2:30 p.m. and fingerprinted the orange juice
3  bottle. At 3:06 p.m., he arrived at the bus stop and took it upon himself to approach Petitioner because he
4  thought he was a good match. (TR 685-686.) He took Petitioner's thumb prints but not the prints of the
5  other suspects. Petitioner was later released.

6  On January 8, 1998, Petitioner was again taken into custody at the San Jose Police Department.
7  Detective Overstreet testified that before Petitioner was advised of his Miranda[3] rights, he stated to
8  detective Overstreet and Officer Cavallo that "I didn't rob no little store." (TR 772.) When Overstreet
9  asked how Petitioner knew what he was talking about, Petitioner responded that he had already been
10  detained on the street for robbery and "knew that it was a little store because . . . an Oriental woman came
11  up to look at him." (TR 772.) Petitioner was then advised of his Miranda rights. He subsequently stated to
12  Detective Overstreet that he had never been in Lee's market on any occasion and that he "didn't bean no
13  lady." (TR 773.) Detective Overstreet asked Petitioner how "he knew that a woman had been struck in
14  the robbery, because we didn't tell him that had happened." (Id.) Petitioner responded that one of the
15  officers at the scene "advised him that that [sic] had happened." (Id.) Overstreet followed up on
16  Petitioner's response by way of talking to some of the officers that had come into contact with Petitioner
17  when he had been detained. (TR 774.) Detective Overstreet then confronted Petitioner and asked him
18  how he could know all the details about this robbery when no one else had informed him about it. At this
19  point, Petitioner put his head down on the table, said "that's it," and refused to talk any further. (TR 776.)

20  At the pretrial evidentiary hearing, Officer Cavallo and Detective Overstreet described their January
21  8, 1998 interview with Petitioner. Their descriptions of the event were the same, with one additional detail:

---

[2] At the preliminary hearing, Lee testified that during the bus stop detention, she was "only about 70 percent sure" about Petitioner's identity. (CT 46.) At the same hearing, she further testified that later on "I was for sure that that's him, because that time, I was very scared and think I couldn't say, you know yes or no. But later on I keep thinking and then I think that was him [sic]." (Id.) At trial, Lee testified that about a week later, she became more certain. (TR 504.)

[3] In Miranda v. Arizona, the Court held that: "[a]t the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. . . Further, the warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." 384 U.S. 436, 468 (1966).

4

1  when they asked Petitioner how he knew the details of the robbery when no one had told him, Petitioner

2  "[p]ut his head down on the table and said, 'that's it. I want to talk to my lawyer.'" (Petitioner's Memo of

3  Points of Authorities In Support of the Traverse to Answer to Petition [hereinafter "Trav."] at 7.) The trial

4  court made a preliminary ruling that the request for a lawyer was inadmissible, but the statement, "that's it,"

5  was admissible.

### 2.   The Trial

7  Petitioner was tried on a one count charge of second degree robbery (Cal. Pen Code §§211-

8  212.5). The sole issue at trial was whether Petitioner committed the robbery. The state introduced the

9  victim's eyewitness testimony, fingerprint evidence recovered from the orange juice bottle, and analysis

10 confirming that one of the three latent fingerprints matched Petitioner's. (TR 701, 726.) During trial,

11 Defense Counsel questioned the validity of the victim's eyewitness testimony, i.e., discrepancies between

12 what she testified to at the preliminary hearing and at trial, and the reliability of fingerprinting identification.

13 (Trav. at 4.) Defense Counsel also attempted to lessen the impact of the Doyle[4] statement during trial. The

14 trial court reiterated its initial ruling during trial in the jury's absence. (TR 741-42.) The court stated:

> All right. we had a pretrial hearing on this, but I just wanted to make sure now that the officer understood what he could and couldn't say. And it was my understanding that the statement will end with defendant – defendant said "that's it," and put his head on the table. Period. Then right after that he said "I want to talk to my lawyer," and that was not going to come in in [sic] the People's case; is that correct?

18 (Id.) Defense counsel responded:

> Your Honor, my suggestion to the Court was that just be the last question about how do you know the details of the robbery or that that not even be asked because that can be addressed in closing argument. Because I think my client said, "that's it" in conjunction with asking for an attorney. I think if we divide it up, it would leave a misleading impression he wanted to cut it off and terminate his cooperation."

22 (TR 742.) The court stated: "that's all right. Maybe he felt he was not being treated fairly. You can argue

23 that too, so – but I certainly – when person [sic] invokes his right to have a lawyer, you are not supposed

24 to put that on the record." (Id.) Defense Counsel responded that "[w]hat I'm doing is objecting to the

25 'that's it,' phrase uttered by client." (Id.) The trial court reaffirmed its initial ruling, finding "that's it" to be

---

[4] In Doyle, the Court held that post-arrest silence after Miranda warnings cannot be commented upon or used by the prosecution. Doyle v. Ohio, 426 U.S. 610, 611 (1976).

more probative than prejudicial.

Defense Counsel also attempted to introduce evidence of possible exculpatory evidence of Petitioner's knowledge of the robbery. Defense Counsel stated:

> I wanted Officer Conover to testify as to the nature of the conversation he had with his fellow officers or perhaps the officers had with each other and his understanding of the content of those conversations. It was my thinking that all of the officers were standing within earshot of my client. It's quite possible they were discussing some of the details of the robbery . . . I wanted to show that my client was privy to some details of the robbery.

(TR 653-54.) The Prosecutor objected and the trial court ruled that the information was hearsay and could not be admitted.

Later, in his closing argument, the Prosecutor asserted:

> The officers were asking him a number of questions about how he knew certain things. At no time does this innocent man, the look of the innocent man, . . . does he ever volunteer the fact that hey [sic], on that day, that day that I got stopped and was detained, I was here with so and so at that time. Check it out. He doesn't do that. What does he do? When he is confronted with the facts that he knows information that only the person who was the robber could know, he terminates the interview. Over. Not talking anymore. End of discussion. That's what he does. The innocent man. That's what he does.

(TR 1045.) Defense Counsel did not object.

### 3. The State Appellate Court Decision

The California Court of Appeal rejected Petitioner's claims concerning the Doyle error. The state appellate court found that even if the Prosecutor crossed the constitutional line, Petitioner was not prejudiced by error. The state appellate court stated:

> One way or another we confront the ultimate question whether defendant was prejudiced by the improper argument. If trial counsel ineffectively failed to object to argument, [sic] the test for prejudice is whether there is a reasonable probability that the defendant would have obtained a more favorable verdict had the objection been made. (Cf. People v. Barnett, 17 Cal. 4th 1044, 1177 (Cal. 1998)). If we deem an objection to have been adequately made or excused, the test for prejudice is whether it was harmless beyond a reasonable doubt. (People v. Galloway, 100 Cal. App. 3d 551, 559 (Cal. App. 1979)).
>
> The Attorney General's brief acknowledged that the applicable test for a Doyle violation is whether the error was harmless beyond a reasonable doubt. (Brecht v. Abrahamson, 507 U.S. 619, 629-630 (1993)). At oral argument the Attorney General invoked a different standard, relying on Greer v. Miller, 483 U.S. 756 (1987). In Greer. the United States Supreme Court found "no Doyle violation occurred in this case" and no due process violation occurred. (Id. at 756-66). Greer, however, does not purport to identify a test for prejudice from a Doyle violation.
>
> Under either test for prejudice, we must ascertain whether the improper argument played a role in defendant's conviction. We reiterate that the only issue at trial was whether

6

> defendant was the robber. In our view, the critical evidence against defendant was not his termination of the police interview but his fingerprint that was found on the orange juice bottle handled by the robber.
>
> At trial, defense counsel argued that defendant might have left the fingerprint on the bottle another time. Defendant repeats this argument on appeal. This argument involves pure speculation. Lee said the robber was a stranger. Defendant told the police he had never been to Joe's Market though he had been to other neighborhood stores. Even if Lee had not identified defendant as the robber, his fingerprint would amount to substantial evidence of his guilt. As this court reiterated in People v. Nguyen, 23 Cal App. 4th 32 (Cal. App. 1994), "[F]ingerprint evidence is the strongest evidence of identity, and is ordinarily sufficient alone to identify the defendant."
>
> Here, however, there was more than a fingerprint. The robbery victim, Lee, identified defendant at trial as the robber, and defendant closely matched the description of the robber broadcast on the police radio, including the missing front teeth and the moustache.
>
> In argument at trial defense counsel pointed out the slight discrepancies between the broadcast description and defendant's height (three to five inches), the number of missing teeth (not half a tooth but floor missing teeth), and clothing. Defense counsel also asserted the uncertainty of Lee's initial identification. Defendant repeats those arguments on appeal. In response, the prosecutor pointed out the extraordinary coincidence of defendant being located a mile from the store an hour after the robbery and so closely resembling the robber, except for some of his clothing.
>
> Defendant also helped to identify himself as the robber through his knowledge of the details of the robbery. He knew that a small store had been robbed and that a lady had been struck.
>
> While the record reflects slight discrepancies in the victim's description and initial uncertainty in her identification, when the identification is coupled with defendant's fingerprint on the bottle handled by the robber and defendant's knowledge of details of the robbery, we are convinced beyond a reasonable doubt that the prosecutor's improper argument did not prejudice defendant.
>
> In light of this conclusion, we further conclude that any error in the admission of defendant's statement - that's it - was harmless. This ambiguous statement was not emphasized in the prosecutor's improper argument.

(Resp't Ex. A at 8-9.)

Regarding Petitioner's claim that the trial court erroneously excluded evidence of what Petitioner might have overheard, the state appellate court stated:

> The remaining question is whether defendant was prejudiced by the trial court's exclusion of this evidence. As a general matter, the application of ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense. Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. If the trial court misstepped, the trial court's ruling was an error of law merely; there was no refusal to allow defendant to present a defense, but only a rejection of some evidence concerning the defense. Accordingly, the proper standard of review is that announced in People v. Watson, 46 Cal. 2d 818, 836 (Cal. 1956) and not the

7

> stricter beyond - a - reasonable - doubt standard reserved for errors of constitutional dimensions <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967), <u>People v. Fudge</u>, 7 Cal, 4th 1075, 1102-03 (Cal. App. 1994).
>
> As noted above, there was some evidentiary significance to defendant having knowledge of details of the robbery know [sic] only to the robber, the victim, and the police. Evidence that defendant could have gained this knowledge from the police could mitigate the significance of what appeared to be his admissions. Here, defendant's offer of proof. He merely stated '[I]t's quite possible' that defendant overheard officers discussing the details. He did not state that defendant had actually overheard them.

(<u>Id.</u> at 11.) The appellate court concluded that Petitioner was not prejudiced by the trial court's erroneous exclusion of what Petitioner could have overheard because his fingerprint was found on a key piece of evidence, he was identified by the victim and he was located near the scene of the robbery.

**B.    Procedural History**

On October 11, 2001, Petitioner filed this petition for writ of habeas corpus for a person in state custody challenging the validity of his conviction (Docket No. 1.) On October 17, 2001, Petitioner requested that the Court appoint an attorney to represent him in his current habeas petition (Docket No. 2.) In an Order dated September 11, 2002, the Court requested that Respondent show cause why the petition should not be granted (docket No. 11.) The Court also granted Petitioner's application to proceed *in forma pauperis*, (Docket No. 8), but denied his motion for appointment of counsel without prejudice for renewal after Respondent filed an Answer (Docket No. 10.) On October 16, 2002, Respondent filed its Answer and Memorandum of Points & Authorities in Support of the Answer to Petitioner's writ of habeas corpus denying that the state court's ruling was based on an unreasonable determination of fact or was contrary to or involved an unreasonable application of clearly established federal law (Docket Nos. 12, 13, 14.) Petitioner renewed his previously filed motion for appointment of counsel (Docket Nos. 15, 16, 17.) On March 29, 2004, the Court granted Petitioner's motion for appointment of counsel (Docket No. 19.) On April 8, 2004, Janice M. Brinckly submitted a statement of counsel accepting appointment to Petitioner's case (Docket Nos. 20 & 21.) On June 24, 2004, counsel for Petitioner filed a motion requesting oral argument on the petition for writ of habeas corpus (Docket No. 22.) On the same date, Petitioner filed a Traverse and Memorandum of Points of Authorities in Support of the Traverse to the Answer (Docket Nos. 23-24.)

This Court considered the Petition on the merits. On March 31, 2005, this Court issued an order

denying the petition for a writ of habeas corpus. This Court held that: (1) the admission of the phrase "that's it" and the Prosecutor's comments on Petitioner's post-Miranda silence and using it to infer guilt constituted harmless error, (2) Petitioner's trial counsel did not provided constitutionally ineffective assistance, (3) the exclusion of testimony from the police officers regarding whether Plaintiff could have overheard details of the crime while being detained did not violate his due process rights.

## ANALYSIS

The Court may not grant a COA unless "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "[A] substantial showing of the denial of [a] federal right" means that a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner], or that the questions are adequate to deserve encouragement to proceed further." Barefoot, 463 U.S. at 893 n.4 (emphasis in original).

**A.  Harmless Error**

    **1.  The Prosecutor's Comments**

Petitioner argues that he was prejudiced by the Prosecutor's comments on Petitioner's post-Miranda statement "that's it" while terminating the police interview. (Petition for COA at 3.) This Court agreed that the Prosecutor committed Doyle error (Doyle v. Ohio, 426 U.S 610 (1976)) by commenting on Petitioner's post-Miranda silence and using that silence to infer guilt.[5] (March 31, 2005 Order at 13.) However, this Court noted that habeas relief is unavailable absent a showing that the error substantially influenced the jury's decision. (March 31, 2005 Order at 13) (citing to O'Neal v. McAninch, 513 U.S. 432, 436 (1995); see also Valerio v. Crawford, 306 F.3d 742, 763-64 (9th Cir. 2002). This Court went on to hold that the error was harmless in light of the Petitioner's fingerprint on the orange juice bottle and the victim's testimony. (March 31, 2005 Order at 15.)

The proper inquiry is whether the state appellate court's harmless error finding was an objectively unreasonable application of the Brecht test for harmless error. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). The Ninth Circuit considers three factors in determining whether comments on post-Miranda

---

[5]Specifically, the Prosecutor argued in summation: "When he is confronted with the fact he kn9ows information that only the person who was the robber would know, he terminates the interview. Over. Not talking anymore. . . The innocent man. That's what he does." (TR 1045.)

silence are harmless error: "[1] the extent of comments made by the witness, [2] whether an inference of guilt from silence was stressed to the jury, and [3] the extent of other evidence suggesting defendant's guilt." United States v. Newman, 943 F.2d 1155. 1158 (9th Cir. 1991)  (applying harmless error review); see also United States v. Kallin, 50 F.3d 689, 693 (9th Cir. 1995) (quoting and following Newman).

      Applying the Newman factors, jurists of reason could not disagree with the California courts' assessment that the Prosecutor's comments did not have "a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  The extent of the comments made by the Prosecutor were limited to a few sentences in his closing argument, and was only one of many arguments relied upon by the Prosecutor.  (TR 1045.)  Indeed, the comments constituted less than one page of the 1100 page transcript.  While the prosecutor did use the post-Miranda silence to stress to the jury an inference of guilt, the extent of other evidence suggesting Petitioner's guilt was substantial.  The victim's testimony and Petitioner's fingerprints constitute overwhelming evidence of Petitioner's guilt.

      Petitioner contends that the victim's (Lee) identification was unreliable.  Petitioner points out that while Lee identified Petitioner at the bus stop line up, she testified at the preliminary hearing that she was only seventy percent certain that Petitioner was the robber at the initial show-up.  Lee testified that she "remember[ed] his [defendant's] face, everything.[6]  But the way he put on the outfit makes me really confused at the time.  Because right after accident, I was just scared and I really don't want to see him no more." (TR 504.)  At trial, Lee testified that at the bus stop line up, she was absolutely certain that Petitioner's face was the same as the robbers but was thrown off by his change of clothes.  (TR 502, 503.) Less than one week after the robbery, Lee became certain that Petitioner was the robber despite his wearing different clothes.  (TR 504.)  At trial, Lee positively identified Petitioner as the robber.  (TR 540.)

      Petitioner points to discrepancies between Lee's original description of the robber and Petitioner. (Petition for COA at 4.)  However, the discrepancies were minor and did not cast substantial doubt on the accuracy of Lee's identification of Petitioner as the robber.  In closing arguments, the defense pointed out that Lee originally described the robber as 5'8" to 5'10" and that Petitioner is 5'5" tall.  (TR 1000.) However, Lee  was on the ground during much of her encounter with the robber.  (CT 12-15; TR 437.)

---

    [6] Lee even recognized the gap in his teeth.

10

Also, the defense pointed out that Lee described the robber as having his upper front tooth missing; Petitioner is missing his four front teeth. (TR 570.) However, at the show up, Lee recognized the gap in Petitioner's teeth as the same gap that she saw during the robbery. (TR 445.)

The defense pointed out that Lee described the robber as wearing a black beanie, puffy, faded black jacket with something gray on the front, and black pants. (TR 440, 455, 570, 574.) About one hour after the robbery, police stopped Petitioner. (TR 623-625.) Petitioner was wearing a red cap, white T-shirt, and lighter pants than the robber wore. (TR 502, 506.) However, Officer Kevin Gagalde testified that a black beanie was found in Petitioner's backpack when he was arrested on January 8, 1998. (TR 522-23, 582-583, 991.) This beanie was admitted into evidence. (TR 584.) Lee testified that this was the same beanie worn by the robber. (TR 523.)

While not identical, Kevin Alexander's description of the jacket worn by Petitioner is similar to Lee's description of the jacket worn by the robber. Alexander lived with Petitioner at a "worker house" for homeless people run by Saint Joseph's Cathedral. Alexander testified that all residents must leave the house between the hours of 7:30 a.m. and 5:00 p.m. (TR 888.) Residents have no key or other method of gaining re-entry to the "worker house" during these hours. (TR 889.) On the day of the robbery, Alexander witnessed Petitioner leave the house with a jacket on. (TR 892.) He testified that the jacket was "perhaps a couple shades of purple, a darker and lighter, or maybe the lighter was gray, but there was definitely purple." (TR 892.) The jacket was "two tone" in color. ((TR 895.) The jacket "was like a satin or satin or silk." (TR 892.)

Officer Kevin Fagalde's testimony corroborated Lee's identification of Petitioner. One and a half hours prior to the robbery at issue, Fagalde testified that he saw Petitioner wearing a black cap and black bulky nylon jacket. (TR 560-61, 575.) Fagalde testified that Petitioner was riding a bike and was accompanied by a second man who was also riding a bike. (TR 561.) This second man was wearing a dark bulky jacket and clothing and he had a beard with gray in it. (TR561.) At least one of the two men had handle bars that were curled. (TR 560.) Fagalde took notice of the men because he wanted to make sure they did not match the general description of individuals who had robbed a bank earlier that day. (TR. 562.) Fagalde testified that when he heard Lee's description of the suspects over the police radio, he "felt

that those persons [Petitioner and the other man described above] I had seen earlier matched perfectly the description of the subjects that had been involved in the robbery [the robbery of Lee's store]." (TR 571.) Indeed, Lee described the robber as a black male wearing a black beanie, puffy, faded black jacket, and black pants. (TR 440, 455, 570, 574.) She described the man outside as an older thinner black male who had dark clothing and a grey beard. She described both men as being on bikes, at least one of which had curled handlebars. (TR 558-62, 568, 595.) Thus, as the Prosecution pointed out in its closing arguments, there was substantial reason to believe that Petitioner committed the robbery and changed his clothes thereafter.

Petitioner contends that the fingerprint on the orange juice bottle does not defeat the claim of prejudice. Petitioner points out that the orange juice bottle had been in a refrigerated shelf with other drinks. (TR 452-54.) Petitioner lived near the market and told police he often frequented "mom and pop" markets in his neighborhood (Lee's store could be considered a "mom and pop" market). (TR 903, 945, 814-815.) From these facts, Petitioner argues "there was a reasonable innocent explanation for his prints on the bottle." (Petition for COA at 4.) Petitioner appears to be repeating the argument made in state court on appeal that Petitioner could have been in the store on another occasion and touched the orange juice bottle. (See Memo of P&A in support of Ans to Petition at 11.) However, the evidence does not support Petitioner's suggestion. Petitioner told the police that he had never been in Lee's market at North 17th Street on any occasion. (TR 4-5, 773.) There is absolutely no evidence in the record to support Petitioner's "reasonable innocent explanation" and Petitioner's after-the-fact speculation is inadequate to cast doubt on the fingerprint evidence.

While there are slight discrepancies between Lee's description of the robber and Petitioner, Lee's description of the robber strongly implicates Petitioner. Her identification of Petitioner is corroborated by both Alexander's and Officer Fagalde's testimony. The Petitioner's fingerprint on the orange juice bottle and other substantial evidence such as Petitioner's being found near the scene of the crime provides substantial support for Lee's identification of Petitioner. (TR 623-25, 773-774.) Thus jurists of reason could not disagree with the California courts' assessment that any error was harmless.

**2.      Admission of Evidence in Violation of <u>Doyle</u>**

Petitioner also contends that he was prejudiced by the admission of Detective Overstreet's testimony that Petitioner put his head on the table and said "[t]hat's it" when asked how he could know details of the robbery that only the robber would know. Petitioner claims that this evidence had a substantial and injurious impact, leaving "the mistaken impression that Petitioner was giving up and admitting his guilt, rather than requesting a lawyer as was his constitutional right." (Petition for COA at 5.) This argument closely resembles Petitioner's argument that the prosecutor's comments constituted harmful error.[7] Accordingly, the same analysis used to determine whether the Prosecutor's comments on Petitioner's post-Miranda silence constituted harmless error is applicable here. Thus, for the reasons stated *supra*, jurists of reason could not disagree with the California courts' assessment that any error was harmless.

## B. Ineffective Assistance of Counsel

Petitioner argues that his Sixth Amendment right to effective assistance of counsel was violated by Defense Counsel's failure to object to the Prosecutor's statement "that's it," in his closing argument in violation of Doyle. (Petition for COA at 5-6.) This Court first concluded that the omission does not amount to ineffective assistance because counsel could have reasonably determined that the objection during the Prosecutor's closing argument would have been futile, given the trial court's earlier ruling that the statement was admissible. This Court also concluded that, assuming arguendo that the failure to object was deficient, Petitioner has not demonstrated prejudice under the standard of Strickland v. Washington, 466 U.S. 668, 686 (1994).

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. Strickland, 466 U.S. at 686. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id. In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional

---

[7] It appears Petitioner separates the arguments to make plain that he contends that irrespective of the Prosecutor's use of his post-Miranda silence to infer guilt, the admission of Detective Overstreet's testimony could have had a substantial and injurious effect on the jury.

norms. Id. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

Petitioner fails to satisfy either prong of the Strickland test. At the first prong, this Court determined that:

> Petitioner failed to make a showing or allege any facts which might suggests the performance of his attorney was deficient. Here, the misconduct alleged is counsel's failure to object to the Prosecutor's improper summation. (Trav. at 17.) For the most part, Petitioner's contention regarding unreasonable conduct rests entirely on a finding of merit to his first claim concerning the prejudicial effect of the trial court's admission of his post-Miranda statement at trial. Even if Petitioner's Defense Counsel failed to make an objection during summation, the relevant inquiry is not what Defense Counsel could have done, but whether the choices made by him were reasonable. See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998). Because Defense Counsel objected to the statement during the pretrial hearing, and later attempted to lessen its impact during cross-examination of the officers, he could have reasonably determined that objection during the Prosecutor's closing argument would be futile. See Strickland, 466 U.S. at 689-691. Because the Strickland standard is based on adequate representation, and not perfection, this omission does not amount to ineffective assistance.

(March 31, 2005 Order at 16.)

At the second prong, this Court determined that Petitioner cannot demonstrate prejudice under Strickland. (March 31, 2005 Order at 16.) This conclusion was reached in light of the record, which indicates that there was more than simply the Prosecutor's closing argument that pointed to Petitioner's guilt.

> In the state appellate court's view, the critical evidence against Petitioner was not his termination of the police interview but his fingerprint, which was found on the orange juice bottle handled by the robber. The California Court of Appeal found that even if the victim had not identified Petitioner as the robber, his fingerprint alone would amount to substantial evidence of is guilt. (Resp't Ex. A at 8)[.] In addition, the appellate court noted that the victim had identified Petitioner. (Id. at 9)[.] . . . Moreover, if the admission of the statement did not unduly prejudice Petitioner's trial, then neither did his Defense Counsel's failure to object to the admission of such evidence. Under these circumstances, it is not evident that but for counsel's failure to make a Doyle objection there exists a reasonable probability that Petitioner's trial would have been different. Strickland, 466 U.S. at 694.

(March 31, 2005 Order at 16.)

For all the reasons previously stated *supra* and in the March 31, 2005 Order, jurists of reason could not disagree with the California courts' assessment that Petitioner's claim of ineffective assistance of

counsel lacks merit.

C. **Exclusion of Evidence**

Petitioner argues that the exclusion of testimony from the police officers regarding whether he could have overheard details of the crime while being detained violated his due process rights and had a substantial and injurious effect on the jury's verdict. (Petition for COA at 6-7.) The California Court of Appeal held that this evidence was erroneously excluded but that any error was harmless. (March 31, 2005 Order) (citing Resp't Ex. A. at 11.) This Court held that there was no due process violation or injurious effect on the jury's verdict because: (1) there was no evidence presented that the officers discussed details of the robbery when Petitioner was detained; (2) there was no evidence that Petitioner heard any details of the crime; (3) there was other substantial evidence indicating Plaintiff's guilt; and (4) the Prosecution's case focused on the credibility of the victim's eyewitness testimony and why Petitioner's fingerprint was on the orange juice bottle, not on Petitioner's knowledge of the details of the crime. (March 31, 2005 Order at 19-20.)

When deciding whether the exclusion of evidence violates the Due process right to a fair trial or the Sixth Amendment right to present a defense, the court applies a five prong balancing test assessing: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. Su Chia v. Cambra, 360 F.3d 997, 1004-06 (9th Cir. 2004) (state court erred by excluding reliable, material evidence of petitioner's innocence); Drayden v. White, 232 F.3d 704, 711 (9th Cir. 2000).

Applying the five factors, no reasonable jurist could disagree that the balance weighs against a due process violation. At Prong One, if there were evidence that Petitioner overheard the officers discussing details of the crime, this might have some evidentiary significance. At Prong Two, the testimony of police officers would probably be reliable. However, it is impossible to determine the centrality or reliability of the "evidence" because such "evidence" is entirely speculative. See Drayden, 232 F.3d at 711. As this Court noted in the March 31, 2005 Order, Petitioner has offered no evidence to support that he overheard the officers discussing details of the case. Petitioner points to Officer Edward Conover's statement that there

were several conversations taking place among police officers within earshot of Petitioner during a twenty minute period while Petitioner was being detained. (Petition for COA at 6; TR 650-651.) Conover testified that the officers were "talking about the fence and we were talking about the dog." (TR 651.) There is nothing in Conover's testimony that would indicate that the officers discussed details of the crime. Moreover, when asked by Detective Overstreet how he knew details of the crime, Petitioner responded that he knew that it was a little store because he had gotten stopped out on the street and an Oriental woman came up to look at him. (TR 772.) Given the speculative nature of the "evidence," the Court also cannot find that at Prong Three that the "evidence" was capable of evaluation by a trier of fact. Thus, the first three prongs do not favor a finding of a due process violation.

Prongs Four and Five strongly weigh against finding a due process violation. At Prong Four, the fingerprint on the orange juice bottle, close proximity of Petitioner to the crime scene, and Lee's identification provide substantial evidence of Petitioner's guilt. At Prong Five, the Prosecution's case (and therefore Petitioner's defense) focused on the credibility of the victim's eyewitness testimony and why Petitioner's fingerprint was on the orange juice bottle, not on Petitioner's knowledge of details of the crime. Thus, Prongs Four and Five weigh against a due process violation.

Even assuming arguendo that Petitioner's due process rights were violated, this does not end the inquiry. Petitioner cannot obtain habeas relief unless he shows that the error was not harmless under Brecht v. Abrahamson. 507 U.S. 619 (1993). In other words, Petitioner must show that the error had "a substantial and injurious effect on the verdict." Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht, 507 U.S. at 623). As the California Court of Appeal noted, the strong fingerprint evidence, the eyewitness identification, and the proximity of Petitioner to the scene of the crime shortly after the robber demonstrate that even if the "evidence" was not speculative, failure to admit it did not infect the trial with unfairness.

In short, the trial court' failure to allow testimony of what Petitioner might have overheard did not violate his right to due process nor did it have "a substantial and injurious effect on the verdict." Bretcht, 507 U.S. at 623. Accordingly, reasonable jurists could not disagree with the California courts' conclusion that any error was harmless.

## **CONCLUSION**

For the foregoing reasons, the certificate of appealability as to whether:

 (1) the admission of the phrase "that's it" and the Prosecutor's comments on Petitioner's post-<u>Miranda</u> silence and using it to infer guilt constituted harmless error is DENIED;

 (2) Petitioner's trial counsel provided constitutionally ineffective assistance is DENIED;

 (3) the exclusion of testimony from the police officers regarding whether Plaintiff could have overheard details of the crime while being detained violated his due process rights is DENIED.

IT IS SO ORDERED.

DATED: 6/29/05           s/Saundra Brown Armstrong
                  SAUNDRA BROWN ARMSTRONG
                  United States District Court Judge